FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

98 JAN -7 PM 4:43

U.S. DISTRICT COUR
N.D. OF ALABAMA

| | | |
|---|---|---|
| **F. LEE ROBINSON, JR.**, | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV 96-N-3198-S |
| | ] | |
| **BOOHAKER, SCHILLACI & COMPANY, P.C.; BEN J. SCHILLACI; JOHN C. BOOHAKER; JOHN H. REAMEY; CLYDE E. PUTMAN; and GREGORY A. GREY**, | ] ] ] ] ] ] | |
| | ] | ENTERED |
| Defendant(s). | ] | JAN 7 1998 |

**Memorandum of Opinion**

**I.   Introduction.**

This is a diversity action in which plaintiff F. Lee Robinson ("Robinson") asserts Alabama state law claims against the accounting firm of Boohaker, Schillaci & Company, P.C. ("BS&C"), and against Ben J. Schillaci ("Schillaci"), John C. Boohaker ("Boohaker"), John H. Reamey ("Reamey"), Clyde E. Putman, and Gregory A. Grey, for breach of contract, stockholder oppression, and unjust enrichment. Defendant BS&C asserts counterclaims against Mr. Robinson for breach of contract. These claims arise out of two agreements entered into by the parties on January 1, 1991, and December 31, 1994, respectively.

Mr. Robinson asserts that BS&C has breached these two agreements by terminating, after June of 1996, monthly payments he was to receive under the agreements; by changing BS&C's cash management practices to his detriment; by failing to allow Mr. Robinson to purchase a life insurance policy owned by the BS&C on Mr. Robinson's life; and by failing

55

to reimburse expenses Mr. Robinson allegedly incurred in 1995 on BS&C's behalf. BS&C, in turn, asserts counterclaims for an injunction and other relief on the ground that Mr. Robinson breached the provisions contained within the two buy-sell agreements.

On November 7, 1997, the court granted the plaintiff's motion for partial summary judgment on BS&C's counterclaims concerning the validity of the non-compete provisions contained in the 1991 and 1994 agreements. By doing so, the court held that the non-compete provisions contained in the agreements were void *ab initio* and that these covenants were, therefore, unenforceable in every respect. The court also concluded that the 1991 and 1994 agreements were themselves not invalid by virtue of the void non-compete provisions. Finally, the court also ruled that the defendants' affirmative, equitable defenses of equitable estoppel, *in pari delicto*, and unclean hands were unavailable in the present action.

The matter is now before the court on the defendants' motion for summary judgment as to all of the plaintiff's claims and as to count 1 of their counterclaim. *Motion for Summary Judgment* at 1 (non-paginated). The motion has been briefed and is ready for decision. The defendants' motion will be granted in part and denied in part.

**II.    Statement of Facts.**[1]

Mr. Robinson is a former shareholder, officer, director, and employee of the defendant firm, BS&C. While an employee of BS&C, Mr. Robinson worked as a licensed certified public accountant (C.P.A.) for BS&C. The business of BS&C (of which all

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

individual defendants are stockholders) is that of a certified public accounting firm or practice. At the end of 1994, Mr. Robinson decided to terminate his association with BS&C and exercised his rights under the buy-sell agreement previously entered into by Mr. Robinson and the defendants in 1990, which was to be effective as of January 1, 1991. The 1991 agreement was supplemented by another agreement dated December 31, 1994. It is undisputed that although Mr. Robinson was in charge of legal matters for BS&C, the 1994 agreement was drafted by defendant Mr. Schillaci.

Both the 1991 and 1994 agreements contained monetary disincentives for any partner leaving BS&C to compete with BS&C. The court, on November 7, 1997, declared these non-compete provisions void under Alabama law. In the 1994 agreement, BS&C promised to purchase Mr. Robinson's stock in BS&C on the following terms: "THE PURCHASE PRICE of Lee's stock in BSR will be $280,000 . . . payable monthly over five years . . . at the rate of $4,666.66 per month." *Plaintiff's Exhibit 6* at 1. When Mr. Robinson left BS&C, BS&C began making these monthly payments. After eighteen months, BS&C ceased making payments on the ground that Mr. Robinson had allegedly breached the 1991 and 1994 agreements by violating the non-compete provisions.[2]

In this action, Mr. Robinson asserts that BS&C has itself breached these two agreements by terminating, after June of 1996, the monthly payments he was to receive under the agreements; by changing BS&C's cash management practices to his detriment, including BS&C's failure to borrow $25,000 to cover equipment purchases, and the withholding of $30,000 in revenues from 1994, which were deferred into 1995; by failing to

---

[2] BS&C paid Mr. Robinson approximately $84,000 of the total of $280,000 pursuant to the 1994 agreement.

3

allow Mr. Robinson to purchase a life insurance policy owned by BS&C on Mr. Robinson's life; and by failing to reimburse expenses Mr. Robinson allegedly incurred in 1995 on BS&C's behalf.

During Mr. Robinson's ten years at BS&C, it was common practice to choose a cutoff date before December 31 and book income received thereafter into the following year. In late 1993, a cutoff date was chosen in such a manner that after that date, monies received were to be reported by BS&C as income for 1994, which would allow Mr. Robinson to receive the benefit of such income in 1994. BS&C determined to defer income received after a late December 1994 cutoff date into 1995.[3]

In years prior to 1994, BS&C, at the direction of its shareholders, made substantial expenditures in connection with the purchase of computer networking and other equipment for the firm, spending between fifty-thousand ($50,000) and seventy-five thousand ($75,000) dollars.[4] Following these annual expenditures, there were discussions among the BS&C shareholders that any loan taken to cover the expended amounts would be paid off by the firm during the year and then partially re-borrowed at year-end so as to spread the total cash effect of the expenditure across several years while minimizing the interest payment. The proceeds of these BS&C's loans were generally distributed to shareholders for the equipment and capital improvements, which had been paid out of the cash flow of the firm.[5]

---

[3] It is disputed among the parties as to whether this cutoff date determination was made consistent with BS&C's prior practices.

[4] The defendants contend that such expenditures took place *only* in 1993; however the defendants cite no evidence in support of the contention. Therefore, the fact that such expenditures took place in years prior to 1994, including 1993, will be deemed admitted for summary judgment purposes.

[5] The plaintiff denies this fact but cites no evidence in support of the denial. Therefore, the fact will be deemed admitted for summary judgment purposes.

4

If BS&C had borrowed money at the end of 1994, and Mr. Robinson ceased to be a shareholder of the firm on December 31, 1994, Mr. Robinson would not have had to pay any of the loan amounts.

In a meeting with Mr. Boohaker and Mr. Schillaci that occurred prior to October 22, 1994, and which resulted in Mr. Robinson preparing an October 22, 1994, memo, Mr. Robinson expressed concerns that changes in accounting policies could be done in a way that would harm him as a departing shareholder in his share of the 1994 firm profits. Also, Mr. Robinson requested that Messrs. Boohaker and Schillaci guarantee him that the policy changes would be done in a "fair manner" and they allegedly agreed to do so. Following this October 1994 meeting, Mr. Robinson sent a memo to Mr. Boohaker and Mr. Schillaci which provided, in part, "[w]e agreed to handle the accounting for BSR at the end of this year consistently with the treatment in prior years. That is, we will recognize income, tax deductions and borrowings consistent with our philosophy in the past."

The expenditures were to be spread across a period of three years and, in 1993, this plan was followed because the money was borrowed and distributed at year's end. However, had the plan been followed as it was discussed among the shareholders, BS&C would have borrowed money at the end of 1994 and would have distributed such sums to the shareholders, including Mr. Robinson. At the direction of its majority shareholders, BS&C elected not to borrow any funds at the end of 1994 for distribution, despite having completely paid off the year-end 1993 loan in 1994. According to Mr. Reamey, the decision to not borrow at the end of 1994 was a change in the firm's practice from prior years. Mr. Robinson, in his capacity as a shareholder of the firm, desired to borrow the money consistent with past firm practice.

It is the 1991 Agreement which forms the basis for Mr. Robinson's claim concerning the life insurance policy owned by BS&C on his life. The 1991 Agreement provides, in pertinent part, that "[i]f the Firm owns a life insurance policy on a shareholder's life, a departing shareholder has the option of purchasing that life insurance from the Firm for 75% of the cash value at the time of his departure." *Defendants' Exhibit 18*, at 10 (1991 Agreement). Mr. Robinson drafted the provision contained in the 1991 Agreement concerning life insurance.[6] Mr. Robinson ceased to be a shareholder of BS&C at the close of business on December 31, 1994. The first time Mr. Robinson said anything to anyone at BS&C about his desire to purchase the life insurance policy was around March - May of 1995, three to five months after he ceased being a shareholder.

The expenses Mr. Robinson claims BS&C failed to reimburse him were incurred between January 1, 1995, and April 15, 1995. The 1994 Agreement provides, "Lee will also spend public relations time (PR time) after April 15, 1995 through December 31, 1995, subject to time mutually convenient to Lee and BSR. This time will not be compensated, but BSR agrees to pay Lee's reasonable out-of-pocket expenses for these trips to Birmingham." *Defendants' Exhibit 19*, at 2 (1994 Agreement).

### III.  Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party

---

[6] The plaintiff denies this fact but cites no evidence in support of the denial. Therefore, the fact will be deemed admitted for summary judgment purposes.

6

asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving

7

party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference

8

but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV.   Discussion.

### A.   Mr. Robinson's Breach of Contract Claims.

Mr. Robinson asserts that BS&C has breached the 1991 Agreement and the 1994 Agreement by terminating, after June of 1996, monthly payments he was to receive under the agreements (the "monthly payments" claim); by changing BS&C's cash management practices to his detriment (the "deferral of income" claim and the "failure to borrow" claim); by failing to allow Mr. Robinson to purchase a life insurance policy owned by the BS&C on Mr. Robinson's life (the "life insurance policy" claim); and by failing to reimburse expenses Mr. Robinson allegedly incurred in 1995 on BS&C's behalf (the "reimbursement" claim). The defendants contend they are entitled to summary judgment with respect to each of Mr. Robinson's breach of contract claims.[7] *See Movants' Initial Submission in Response to Exhibit D of the Court's Order*, at 1. The court addresses each of the plaintiff's breach of contract claims in order.

#### 1.   The "Monthly Payments" Claim.

In their motion for summary judgment, the defendants contend that "[b]ecause it is undisputed that Robinson violated his agreement not to compete with the business of the Firm which was a part of each of the agreements on which Plaintiff bases his breach of contract claims, Defendant BSC is entitled to a summary judgment in its favor with respect

---

[7] Although the defendants argued in their initial submission that Mr. Robinson's breach of contract claims were barred because of his alleged breach of the non-compete provisions contained in the 1991 and 1994 Agreements, the defendants, in their reply submission, have acknowledged that "this Court's November 7, 1997 Order granting Plaintiff's Motion for Partial Summary Judgment presently precludes this basis for Movants' Motion for Summary Judgment." *Movants' Reply Submission in Response to Exhibit D of the Court's Order*, at 2.

9

to Count 1 of the Complaint." *Movants' Initial Submission In Response to Exhibit D of the Court's Order*, at 2. However, as noted *supra* n. 7, the defendants, in their reply submission, properly retracted this argument pursuant to the court's order entered November 7, 1997. Because the defendants have offered no further argument or authority on this point, the defendants' motion for summary judgment will be denied as to Mr. Robinson's "monthly payments" breach of contract claim.

### 2. The "Deferral of Income" Claim.

As the defendants point out in their brief, Mr. Robinson has failed to address the defendants' argument that BS&C did not breach any agreement by deferring income from 1994 to 1995. *Movants' Reply Submission in Response to Exhibit D of the Court's Order*, at 2. The only reference to a breach of contract, deferral of income theory in Mr. Robinson's opposing brief is in support of his claims for stockholder oppression and unjust enrichment.

Indeed, the 1991 Agreement states that "[b]y signing this memorandum, we acknowledge that this document outlines our intentions and agreements. *We agree to sign formal documents when drafted that will more specifically list the terms and conditions of our agreement.*" *Plaintiff's Exhibit 16* (1991 Agreement), at 11 (emphasis added). Certainly, the December 31, 1994, Agreement, *signed* by the parties to this action, served to "more specifically list the terms" of the 1991 partnership agreement. The record, however, contains an October 22, 1994, memorandum drafted by Mr. Robinson to Mr. Schillaci and Mr. Boohaker outlining Mr. Robinson's desire that the firm's year-end accounting practices, including deferral of income and borrowing, would be consistent in 1994 "with [the firm's] philosophy in the past." *Plaintiff's Exhibit 23* (Robinson memo dated Oct. 22, 1994).

10

Apparently, however, by the time Mr. Robinson and the firm signed the December 31, 1994, agreement, the parties agreed not to include any language concerning year-end deferral of income or year-end borrowing practices for 1994. Mr. Robinson has failed to present evidence that, in accordance with their 1991 Agreement, any one of the defendants *signed* a contract that includes such terms. *See Plaintiff's Exhibit 16* (1991 Agreement), at 11. Accordingly, the defendants' motion for summary judgment will be granted as to Mr. Robinson's "deferral of income" breach of contract claim.

### 3. **The "Failure to Borrow" Claim.**

As with his "deferral of income" claim, Mr. Robinson fails in his responsive submission to counter the defendants' argument that BS&C did not breach any agreement by failing to borrow money to distribute to Mr. Robinson at the end of 1994. Upon due consideration, the court will grant the defendants' motion for summary judgment on Mr. Robinson's "failure to borrow" breach of contract claim.

### 4. **The "Life Insurance Policy" Claim.**

The 1991 Agreement entered into by the parties contained, *inter alia*, the following clause:

> If the Firm owns a life insurance policy on a shareholder's life, a *departing shareholder* has the option of purchasing that life insurance from the Firm for 75% of the cash value at the time of his departure.

*Defendants' Exhibit 18*, at 10 (1991 Agreement). Mr. Robinson ceased being a shareholder of BS&C at the close of business on December 31, 1994. As a result, the defendants argue that Mr. Robinson was not a "departing shareholder" when he first attempted to purchase the insurance policy from BS&C in April or May of 1995 and, therefore, BS&C's refusal to

11

sell the policy to him was not a breach. *Movants' Initial Submission In Response to Exhibit D of the Court's Order*, at 4.

However, as Mr. Robinson points out, the term "departing shareholder" is susceptible to varying interpretations, particularly in the context of the entire clause. *See Opposing Party's Submission in Response to Exhibit D of the Court's Order*, at 6; *see also Cannon v. State Farm Mut. Auto. Ins. Co.*, 590 So. 2d 191 (Ala. 1991) (holding that ambiguity exists when a term is reasonably susceptible to more than one interpretation). Because the term "departing shareholder" is not expressly defined in the 1991 Agreement, it conceivably is broad enough to include Mr. Robinson's relationship to BS&C in April or May of 1995. In fact, it is reasonable to conclude that all parties considered Mr. Robinson a "departing shareholder" for a period well into 1995, pursuant to the terms of the 1994 Agreement requiring him:

> to use his best efforts to see that there is an orderly transition of his client base to other members of BSR. These best efforts will include coming to the Birmingham Office extensively during the 1995 tax season. Lee will also spend public relations time (PR time ) after April 15, 1995 through December 31, 1995. . . .

*Plaintiff's Exhibit 17*, at 1-2 (1994 Agreement). Arguably, at the point in time Mr. Robinson sought to purchase the policy, he was still in the process of "departing" from BS&C in that the transition of the client base from Mr. Robinson to other members of the firm was continuing. *See Plaintiff's Exhibit 23*, ¶6 (Robinson Declaration).

The defendants contend, on the other hand, that the clause concerning the purchase of the life insurance policy clearly requires any purchase to be made "at the time of his departure." *Movants' Initial Submission In Response to Exhibit D of the Court's Order*, at 4. The defendants emphasize this language contained in the contract, which provides that

12

"a departing shareholder has the option of purchasing that life insurance from the Firm for 75% of the cash value *at the time of his departure.*" *Id.* (quoting *1991 Agreement*) (emphasis added). However, it is not clear whether "at the time of his departure" fixes the price of the policy (*i.e.*, ". . . for 75% of the cash value at the time of his departure") or whether it creates a time limitation for purchasing the policy. Cogent arguments can be made on both sides here. As a result, the court concludes that this clause is ambiguous.

Once found ambiguous, Alabama law directs that "the determination of the true meaning of the contract in question is a question of fact to be resolved by the jury." *McDonald v. Die Casting & Dev. Co.*, 585 So. 2d 853, 855 (Ala. 1991); *Dill v. Blakeney*, 568 So. 2d 774 (Ala. 1990); *see also Whitetail Development Corp., Inc. v. Nickelson*, 689 So. 2d 865, 867 (Ala. Civ. App. 1996) (stating that "[a]mbiguity in a contract precludes the trial court from entering summary judgment"). Accordingly, the defendants' motion for summary judgment on Mr. Robinson's "life insurance policy" claim will be denied.

### 5. The "Reimbursement" Claim.

In his responsive submission, Mr. Robinson "agreed to concede summary judgment on Robinson's breach of contract claim for failure of BS&C to reimburse certain out-of-pocket expenses." *Opposing Party's Submission in Response to Exhibit D of the Court's Order*, at 12 n.4. Accordingly, summary judgment will be granted in favor of the defendants on this specific claim.

### B. The Minority Shareholder Oppression Claim.

In his complaint, Mr. Robinson claims that the majority shareholders at BS&C conducted the corporate affairs at the end of 1994 in such a way as to oppress his rights as

13

a minority shareholder. *Complaint* ¶10. Specifically, Mr. Robinson asserts that the defendants manipulated the time in which corporate earnings would be realized so as to oppress Mr. Robinson's minority shareholder interest and changed the firm's customary cash-management practices to his detriment, namely, (i) failing to borrow $25,000 to cover equipment purchases, and (ii) withholding $30,000 in revenues from 1994 and deferring such amounts to 1995. *Opposing Party's Submission in Response to Exhibit D of the Court's Order* at 8.

The Alabama Supreme Court has recognized that minority shareholders have a right to fairness by the majority and that minority shareholders may not be deprived of their just share of corporate gains even though the majority has the right of control of the corporation. *Michaud v. Morris*, 603 So. 2d 886, 888 (Ala. 1992); *Burt v. Burt Boiler Works, Inc.*, 360 So. 2d 327 (Ala. 1978); *Galbreath v. Scott*, 433 So. 2d 454 (Ala. 1983); *Ex parte Brown*, 562 So. 2d 485, 492 (Ala. 1990). In other words, "[c]ertain basic expectations of investors are enforceable in the courts, and among those is a right to share proportionally in corporate gains." *Michaud*, 603 So. 2d at 888.

Thus, under Alabama law, "Shareholders in close corporations have a right to share in corporation earnings, and a majority cannot deprive such shareholders of that right by failing to declare dividends or otherwise manipulating corporate earnings to squeeze out minority interests." *Michaud*, 603 So. 2d at 888 (citing Andrew P. Campbell, *Litigating Minority Shareholder Rights and the New Tort of Oppression*, ALA. LAWYER (March 1992) at 111).

Applying these principles to the facts of this case, Mr. Robinson has presented evidence that just such a "manipulation of corporate earnings" by BS&C took place at the

14

end of 1994. As to the equipment purchases, one of the defendants, Mr. Reamey, testified that BS&C's decision not to borrow money to cover those purchases constituted a departure from the cash management practices of years past:

> Question: And on that decision, you changed the way you had been doing it in prior years, correct?
> Answer: Correct.

*Plaintiff's Exhibit 20*, at 30 (Reamey Deposition); *see also Plaintiff's Exhibit 18*, at 193 (Boohaker Deposition) (noting that the money would have been borrowed and distributed at year-end 1994 if prior firm practices had been followed). Arguably, the effect of this departure from past practice was to deprive Mr. Robinson, a minority shareholder, of distributions from the loan that he would have received in 1994. *See Plaintiff's Exhibit 23*, ¶4 (Robinson Declaration). At the same time, the 1995 proceeds available to the majority shareholders for distribution were increased because the entire equipment expenditure was paid for in full during the year 1994. *See id.* The defendants' motion for summary judgment will be denied as to Mr. Robinson's "failure to borrow" claim on his theory of shareholder oppression.

However, the defendants' motion will be granted as to Mr. Robinson's "deferral of income" claim on his theory of shareholder oppression. Mr. Robinson claims only that BS&C withheld $30,000 in revenues from 1994 and deferred this amount to 1995 and, by doing so, denied him of substantial proceeds. *Complaint*, ¶¶8 & 10; *Opposing Party's Submission in Response to Exhibit D of the Court's Order* at 9. Plaintiff's bald assertion

15

that the cut-off date for deferring income from 1994 into 1995 was "earlier than usual," *id.* at 9, does not constitute a *fact* demonstrating that there is a genuine issue for trial.[8]

### C. Mr. Robinson's Unjust Enrichment Claim.

In his complaint, Mr. Robinson claims that "the defendants have unjustly enriched themselves at the expense of Robinson." *Complaint* ¶11. The defendants argue that summary judgment on this unjust enrichment claim is proper because such a claim is only properly based upon an *implied* contract, not claims brought pursuant to an express contract (or contracts), as the plaintiff has done here. *Movant's Initial Submission in Response to Exhibit D of the Court's Order*, at 6.

Indeed, as Mr. Robinson recognizes, "'where an express contract exists between two parties, the law generally will not recognize an implied contract regarding the same subject matter'." *Opposing Party's Submission in Response to Exhibit D of the Court's Order*, at 10 (quoting *Kennedy v. Polar-BEK & Baker Wildwood Partnership,* 682 So. 2d 443, 447 (Ala. 1996)). Because the defendants, at least for purposes of their summary judgment motion, have assumed the existence of the agreements on which Mr. Robinson bases his several claims, Mr. Robinson's unjust enrichment claim cannot lie. Accordingly, the defendants' motion for summary judgment will be granted on this claim.

---

[8] Indeed, Mr. Robinson's assertion is especially curious, as the defendants point out, in light of his deposition testimony: "Q: Do you happen to know what the cutoff date in 1994 was? A: No, sir." *Plaintiff's Exhibit 22*, at 235 (Robinson Deposition).

16

## V.     Conclusion.

Accordingly, the defendants' motion for summary judgment will be granted in part and denied in part. The court will enter an appropriate order in conformity with this opinion.

Done, this 7th of January, 1998.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE