# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

F I L E D

APR -4 PM 12: 04

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| F. LEE ROBINSON, | ] |
| | ] |
| Plaintiff, | ] |
| | ] |
| vs. | ]     CV-96-N-3198-S |
| | ] |
| BOOHAKER, SCHILLACI & COMPANY, P.C., et al., | ] |
| | ] |
| Defendant. | ] |

ENTERED

APR 0 4 2001

## MEMORANDUM OF OPINION

### I.   Introduction.

This case is before the court on motion of the defendants for Partial Summary Judgment (Doc. 110), the defendants' Motion to Strike Affidavit of F. Lee Robinson (Doc. 119), and the plaintiff's Motion for Summary Judgment on Defendants' Counterclaims (Doc. 114).   The motions have been fully briefed and are ripe for decision. Upon due consideration, all such motions will be denied in all respects.

### II.   Motion to Strike Affidavit of F. Lee Robinson

Defendants move the court to strike the affidavit of F. Lee Robinson, plaintiff's ex. 11 of plaintiff's response to defendants' Motion for Partial Summary Judgment. Defendants argue that plaintiff attempts, through his affidavit, to create genuine issues of material fact by attempting to dispute the Undisputed Facts contained in this Court's Pretrial Order of October 31, 1997 and/or his previous deposition testimony.

131

According to Rule 16(e), Federal Rules of Civil Procedure, Pretrial Orders "shall control the subsequent course of the action unless modified by a subsequent order." Fed.R.Civ. P. 16(e). Further, on the last page of the Pretrial Order in this case, this court stated "[i]t is ordered that the above provisions be binding on all parties unless modified by further order for good cause shown." No request for modification has been made by the plaintiff. The Eleventh Circuit has said that it "ha[s] not hesitated to back up district courts when they put steel behind the terms of pretrial orders and hold parties to them." *Morro v. City of Birmingham*, 117 F.3d 508, 515 (11th Cir. 1997). When a party has admitted to facts contained in a pretrial order, those facts are deemed binding on that party. *Cf. Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1016 n.34 (11th Cir. 1982) (finding that appellant abandoned further litigation of issue admitted in pretrial order). The law strongly supports the adherence to the terms and facts in a pretrial order, and this Court will not permit Mr. Robinson to now back away from facts long ago admitted by him.

As for the alleged differences between Robinson's deposition and affidavit:

> The law in this circuit is that a party cannot give "clear answers to unambiguous questions" in a deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction. *Van T. Junkins and Associates v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir.1984). When this occurs, the court may disregard the affidavit as a sham. *Id.* at 658-59. We apply this rule sparingly because of the harsh effect this rule may have on a party's case. In addition, we feel that "to allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the . . . affiant . . . was stating the truth." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986). Thus, our cases require a court to find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit. *See id.* at 954. If no inherent inconsistency exists, the general rule allowing an affidavit to create a genuine issue "even

it if [sic] conflicts with earlier testimony in the party's deposition,"
*Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980), governs. n11
In these instances, any conflict or discrepancy between the two documents
can be brought out at trial and considered by the trier of fact.

*Rollins v. Techsouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987). In this case, there is no

inherent inconsistency between the deposition and affidavit. After a review of each factual

dispute listed by the defendant in the motion to strike, however, the Court has stricken

some of plaintiff's denials as they are not supported by the evidence or were admitted by

the plaintiff in the pretrial order. All of the following facts come from defendants' statement

of facts in their motion for summary judgment:

### A.     Movant's Fact #25:

"At the time Robinson left the Firm on December 31, 1994, business planning and

advice was a portion of the business of the Firm." Robinson argues that defendants' answer

and Schillaci's deposition include admissions that the Firm was a CPA firm. These

admissions are not inconsistent with the Firm undertaking to perform services in addition

to those ordinarily associated with that of a CPA firm. The statement that the Firm is a CPA

firm hardly excludes other services that may be provided by it. Plaintiff is inferring

something that is not there. Plaintiff's denial of this fact is stricken. This fact is undisputed;

by the inclusion of Fact #20 in the Pretrial Order, both parties agreed to this fact. Moreover,

in Robinson's deposition, he agrees that a portion of the business of the Firm was business

planning, advice, and consultation.

Robinson also argues that the Firm can only undertake the profession of public

accounting under the laws of Alabama. Whether or not the Firm is in violation of the laws

of incorporation of the state of Alabama is not an issue to be decided in this case nor is it relevant to determining what types of activities were actually carried on by the Firm.

**B.     Movant's Facts #29, #30:**

Fact #29: "Prior to December 31, 1994, the Firm gave business and financial advice to Joy Adams for a fee." Fact #30: "Prior to December 31, 1994, the Firm provided services to Joy Adams which included dealing with banks, lawyers, real estate agents and general management advice." Plaintiff's denial is stricken. These facts also were undisputed facts agreed to by the parties in the pretrial order. Plaintiff cites no evidence to support his denial.

**C.     Movant's Fact #40:**

"Prior to December 31, 1994, the Firm met with Mr. and Mrs. Goodwin about their financial affairs." This fact is deemed fully admitted.[1] Again, this fact was undisputed and agreed to by both parties in the pretrial order.

**D.     Movant's Fact #42:**

"Robinson met with Mr. and Mrs. Goodwin about their financial affairs after Robinson left the Firm and prior to Mr. Goodwin's death." This fact almost exactly mirrors plaintiff's own words in his deposition. This fact is deemed admitted. The appropriate response for plaintiff in this situation, in which plaintiff did make such a statement but would like to clarify the context of the statement, is "admitted but context clarified in brief," a response allowed by Exhibit D of the Court's Initial Order.

---

[1]The plaintiff's response was "[a]dmitted to the extent BS&C was engaged in the practice of certified public accounting and offered services directly related to certified public accounting."

**E.     Movant's Fact #44:**

"Robinson's work for the Goodwin's [sic] after he left BS&C and before Mr. Goodwin's death, included discussions about the stock and bond markets." Plaintiff validly objects to this fact. The defendant characterizes the plaintiff's actions as "work" and there appears to be no evidence to support that characterization.

**F.     Movant's Fact #51:**

"In 1995, after the sale of his stock in the Firm, Robinson conducted due diligence investigation of Marketplace Promotions and reported the results of his investigation to Jerry Mead of Sutherland & Associates." Here again, the plaintiff's deposition supports the fact, but the plaintiff denied the fact in an attempt to clarify and explain further what was said. This fact is deemed admitted.

**III.     Statement of Facts.[2]**

**A.     The Parties**

Plaintiff F. Lee Robinson ("Robinson") is a former shareholder, officer, director and employee of Boohaker, Schillaci & Company, P.C. ("BS&C"), which was previously known as Boohaker, Schillaci, Robinson & Company, P.C. Individual defendants Ben J. Schillaci ("Schillaci"), John C. Boohaker ("Boohaker"), John H. Reamey ("Reamey"), Clyde E. Putnam ("Putnam"), and Gregory A. Grey ("Grey") are directors and shareholders of BS&C.

---

[2]The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994).

**B.    The 1991 Agreement**

On January 1, 1991, Robinson and each individual defendant entered into an agreement regarding changes in their entity structure and in the Buy-Sell agreement that would apply should one or more shareholders depart.  A noncompete agreement was discussed among the shareholders of the Firm in connection with the drafting of the agreement.  Robinson was responsible for preparing the 1991 agreement and he, in particular, worked on drafts of the agreement.  The agreement includes an economic disincentive for a shareholder who leaves the Firm to compete in any way with the business of the Firm.  The agreement (and Robinson's notes on a draft of the agreement) defines "competition" as follows:

> For purposes of this Agreement, a shareholder is deemed to be competing if he does any work for clients of the Firm (clients are determined at date of shareholder's departure from the Firm) within three years after the date of his departure.  This does not preclude the departing shareholder from doing any work for the Firm's clients if such work does not compete with the Firm in any way.

**C.    Robinson's Departure from the Firm and the 1994 Agreement**

In the latter part of 1994, Robinson decided to terminate his association with BS&C and exercised his rights under the 1991 agreement.  On December 31, 1994, Robinson and BS&C entered into what has become known as the 1994 agreement to purchase the stock of Robinson in BSR&C, which included the following language:

> SELLER, LEE, hereby agrees not to compete in any way with the business of the Firm for a five-year period beginning January 1, 1995 and ending December 31, 1999.  Competing is defined as doing any work for the clients of BSR (clients are determined as of the effective date of this Agreement).  This does not preclude Lee from doing any work for BSR's clients if such work does not compete with BSR in any way.

The 1994 agreement was drafted by Schillaci.  Among the provisions contained in the agreement was a promise by defendants to purchase Robinson's stock for "$280,000 . . . payable monthly over five years . . . at a rate of $4,666.66 per month."  The agreement to pay $280,000 was dealt with on the books of the Firm as an acquisition of treasury stock and characterized by defendants as a sale of stock.  During negotiations leading up to the agreement, Robinson assured the firm that he would not be competing with the Firm following his departure and that those provisions contained in the 1991 agreement which dealt with a shareholder who left the firm to compete would not be applicable to Robinson's departure from the firm.  The firm would not have agreed to the 1994 agreement without Robinson's agreement not to do work for the firm's clients if such work competed with the business of the firm.[3]  Robinson resigned from the firm at the end of 1994.  BS&C stopped payments of the $280,000 after 18 months, in June of 1996.  The firm had paid Robinson approximately $84,000.

The 1991 and 1994 agreements do not define the "business of the firm."[4]

---

[3]Plaintiff disputes this fact but it was undisputed in the pretrial order.

[4]The defendant denies this fact and cites both agreements, but the court can find no such language in the agreements.

- 7 -

### D.   Woodham and Waldrop Matters[5]

Beginning on October 30, 1986, and continuing for several years, John W. Gant, Jr.,

("Gant") formerly a partner in the Birmingham law firm of Lange, Simpson, Robinson &

Somerville, performed some legal work for BS&C. Plaintiff Robinson was the primary

"contact person" for legal matters at the firm.[6] Gant testified in his deposition that Robinson

acted as a "conduit of information and advice" for the firm regarding legal matters.

Although Gant discussed legal matters with most, if not all, of the principals of BS&C, he

spoke most frequently with Robinson regarding such legal matters.

In the mid to late 1980s, Gant assisted BS&C with two separate disputes, the

Woodham and Waldrop matters, each of which involved, among other things, the

enforceability of covenants not to compete against professionals who had formerly been

employed with BS&C.  In the Waldrop matter, Gant testified in his deposition that he

advised Schillaci that the covenant not to compete would be difficult to enforce due to

Waldrop's professional status.   Schillaci testified that Gant never told him there was a

problem with the enforceability of a covenant not to compete as to a professional person.

---

[5]Plaintiff's facts #20, "On November 16 and 17, 1989, Boohaker and Schillaci were listed as attendees at a conference in which Harold Apolinsky gave a presentation, supported by written materials, addressing, among other issues, the enforceability of covenants not to compete against professionals," and #21, "In addition to the Woodham and Waldrop matters, Gant discussed other cases with Boohaker and Schillaci regarding covenants not to compete prior to the execution of the 1991 and 1994 agreements," are not supported by the evidence and therefore are not included here as undisputed facts.

[6]Plaintiff disputed defendant's fact #12: Robinson was in charge of legal matters for the Firm.  In Robinson's deposition, when asked what were his responsibilities at the firm, Robinson replied "I was in charge of the general administrative areas, legal areas, and there may have been some others I can't recall."  The questioner then asked "All Right.  When you say legal areas can you just give me an example of what you mean by that?  What kinds of things might have fallen into that category?"  Robinson replied, "[t]he accounting firm was sued one time and I was the, I guess, the contact person related to that." Movant's Initial Submission in Resp. to Ex. D of the Ct.'s Order, Ex. 4 (Robinson depo.) at 129.

According to Gant, when a dispute arose in the Waldrop matter in the mid to late 1980s regarding the enforceability of the covenant not to compete, Robinson argued forcefully that the covenant was valid and enforceable.

The parties disagree regarding the identity of the person who was responsible for preparing the 1986 Sales Agreement and Consulting Agreement between BS&C and Woodham. According to Robinson, Gant was responsible for preparing the agreement.[7] Moreover, Robinson was not the proponent of the covenants to compete contained in the agreements. It is undisputed that Gant wrote Robinson a letter enclosing drafts of a Sales Agreement and Consulting Agreement between BS&C and Woodham and stating, in part: "[A]s we discussed by telephone, the covenant not to compete is probably unenforceable under Alabama law because Gene is a professional, but we have included it anyway for whatever it is worth." Robinson admitted that he read the letter from Gant.  On December 8, 1986, Gant wrote Robinson a letter which included the statement, "I have a few comments I would like to discuss with you prior to closing.  These relate primarily to the Woodham non-compete."  Gant subsequently discussed with Robinson the uncertainty of the enforcement of the non-compete clause and Robinson said he understood.  Although Gant was of the general opinion that covenants not to compete were difficult to enforce against professionals when he provided legal advice regarding the covenants not to compete in the Woodham and Waldrop matters, given the uncertainty of the law at that time, Gant was not unequivocally certain that such covenants were unenforceable and never advised Robinson that such covenants were unquestionably unenforceable.

---

[7]According to defendants, Robinson was responsible for preparing the agreement.

- 9 -

In late 1988 and 1989, an issue arose concerning whether William G. Waldrop ("Waldrop") had violated a non-compete provision contained in an agreement between him and the firm dated September 1, 1984. Gant prepared a draft letter stating that the non-compete agreement with Waldrop was unenforceable under Alabama law and sent the letter to Robinson. On July 5, 1989, Gant wrote Robinson a letter enclosing a copy of the *Mann v. Cherry, Bekaert* case. On July 7, 1989, Robinson wrote Gant a two-page letter in which he discussed his views of the *Mann* case. After receiving Robinson's letter, Gant discussed the letter with Robinson and told him that he (Gant) still believed there was a serious question about the enforceability of the non-compete agreement with Waldrop.

On July 27, 1998, Gant wrote Robinson a letter enclosing a copy of the *Burkett v. Adams* case "for your review on the question of whether Mr. Waldrop's activities constitute practice of a 'profession.' Also enclosed is the letter to Mr. Waldrop we discussed."

As to any knowledge of the enforceability of noncompetes, plaintiff notes that Boohaker and Schillaci are listed as attendees of a federal tax clinic at the University of Alabama held in 1989, although it is not known that they actually attended the conference, at which plaintiff claims the enforceability of a covenant not to compete was discussed. Plaintiff also notes that he let his CPA license fall into inactive status in accordance with the 1991 and 1994 agreements.

### E.    Joy Adams

As of December 31, 1994, the Firm was doing work for Joy Adams ("Adams"), Destin Management Company, Ft. Walton Square, a farm, and Joy Adams' children. Prior to that

time, the firm provided business and financial advice to Adams for a fee.[8] Also prior to that time, the firm provided services to Adams which included dealing with banks, lawyers, real estate agents and general management advice.[9] After departing from the firm, Robinson's work for Adams has included dealing with banks, lawyers, real estate agents and general management in his capacity as business manager. According to the plaintiff, Adams retained a Certified Public Account from Montgomery, Alabama, to handle her accounting work in 1995. In the Spring of 1996, Robinson began providing advice to Adams and now serves as business manager for Destin Management Company. As such, he deals with real estate agents, banks, and lawyers. At the time Robinson left the firm on December 31, 1994, business planning and advice was a portion of the business of the firm.[10]

Robinson currently operates his business ventures through Marpoint, Inc. In 1995, Robinson formed Marpoint, a corporation of which Robinson and his wife are the sole shareholders. According to Robinson, Marpoint is not an accounting firm. In approximately January 1996,[11] Marpoint was paid by Adams for work done related to Fort Walton Square, specifically miscellaneous work and telephone calls. Adams had received telephone calls in reference to Fort Walton Square from Robinson while he was associated with the firm. Further, Marpoint was paid for services rendered on March 31, 1996, described as

[8]This is defendant's fact #29 and undisputed fact #29 from the Pretrial Order. Discussion of Motion to Strike Affidavit *supra*.

[9]This is defendant's fact #30 and undisputed fact #27 from the Pretrial Order. Discussion of Motion to Strike Affidavit *supra*.

[10]This is defendant's fact #25 and undisputed fact #22 from the Pretrial Order. Discussion of Motion to Strike Affidavit *supra*.

[11]Plaintiff admits this fact but is unsure of the exact date.

- 11 -

preparing for a meeting to review trust statements.  Adams had conversations or meetings with Robinson concerning trust statements while he was associated with BS&C.

### F.   The Goodwins

Prior to December 31, 1994, the firm met with Mr. and Mrs. Goodwin about their financial affairs.[12]  The firm's work for the Goodwins included discussions of the bond and stock market. After he left the firm and prior to Mr. Goodwin's death, Robinson met with Mr. and Mrs. Goodwin about their financial affairs.[13]  Robinson admits he spoke to the Goodwins about the stock and bond market but disputes the characterization of his discussions as "work." According to the plaintiff, he informally and without pay discussed certain financial matters with the Goodwins during personal, non-business conversations he had with them following his resignation from BS&C and prior to Mr. Goodwin's death.  Following Mr. Goodwin's death, Adams asked Robinson to serve as the business manager for Mr. Goodwin's business affairs.

### G.   Sutherland & Associates

In regards to due diligence work, Robinson has been doing this type of work for many years.  While he was a shareholder of the firm, he performed due diligence work along with the other shareholders in the firm.  Prior to Robinson's departure from the firm, one of the firm's clients was Sutherland & Associates ("Sutherland"), for whom it performed due diligence work.  In fact, in 1994, Robinson, on behalf of the firm, conducted a due

---

[12]This is defendant's fact #40 and undisputed fact #31 from the Pretrial Order.  Discussion of Motion to Strike Affidavit *supra*.

[13]This is defendant's fact #42.  Discussion of Motion to Strike Affidavit *supra*.

diligence investigation of PSI for Sutherland for which the firm was paid by Sutherland. The services performed by Robinson on behalf of the firm for Sutherland in connection with its investigation of PSI in 1994 consisted of looking at the financial statements and talking with the owner. After Robinson left the firm, in 1995, Robinson conducted a due diligence investigation of Marketplace Promotions and reported the results of his investigation to Jerry Mead of Sutherland.[14] According to the plaintiff, he was asked by Jerry Mead and Carolyn Sutherland to consider a personal investment in Marketplace Promotions, and this is why he conducted the due diligence investigation. Robinson's investigation of Marketplace Promotions included reviewing financial statements. He stresses this investigation was for personal reasons. Sutherland, through an affiliate, acquired certain assets of Marketplace Promotions in May 1996.

On August 26, 1998, this Court entered an order certifying a question to the Supreme Court of Alabama. On March 17, 2000, the Alabama Supreme Court issued its opinion answering this Court's certified question.

## IV. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

---

[14]This is defendant's fact #51. Discussion of Motion to Strike Affidavit *supra*.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law

will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).

Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The

- 15 -

nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## V.   Defendants' Motion for Partial Summary Judgment

Defendants seek summary judgment on the plaintiff's breach of contract claim. Specifically, defendants ask the court to determine if summary judgment may be ordered on the claim that defendants breached their contractual obligation to the plaintiff to make monthly payments to him in exchange for his interest in the firm.

This court certified a question regarding this issue to the Alabama Supreme Court:

> Under Alabama law, does the doctrine of in pari delicto as an affirmative defense bar a former professional employee from recovering compensation under an agreement with his former employer, when such former professional employee directly participated in the negotiation of an unlawful non-compete provision contained within the agreement, while having knowledge that the non-compete agreement was unlawful under Alabama law, when the former employee violates the non-compete provision by entering into competition with his former employer?

*Robinson v. Boohaker, Schillaci & Co., P.C.*, No. 1972152, 2000 Ala. LEXIS 89, at *1 (Ala. March 17, 2000). The court recast the question as follows and answered in the affirmative.

> If a former employee violates a noncompetition provision in a buy-sell agreement drafted by the employer, under circumstances where the employee knew when he entered into the agreement that the provision was illegal and unenforceable, in an action by the former employee against the employer upon the employer's ceasing to make payments due the employee under the agreement, does the doctrine of in pari delicto prevent the employee from avoiding the consequences of his breach of the noncompetition clause by asserting its illegality?

*Id*. at *7-8.

This Court is left to answer two questions: (1) Did Robinson know the agreement was unenforceable and (2) did he compete with the firm in violation of the terms of the noncompete provision?

**A.    Did Robinson know the agreement was unenforceable?**

Gant told Robinson that he believed such non-compete agreements were unenforceable against professionals. It is undisputed that Gant wrote Robinson a letter enclosing drafts of a Sales Agreement and Consulting Agreement between BS&C and Woodham and stating, in part: "[A]s we discussed by telephone, the covenant not to compete is probably unenforceable under Alabama law because Gene is a professional, but we have included it anyway for whatever it is worth." Robinson admitted to reading the letter from Gant. In regards to the Waldrop matter, Gant prepared a draft letter stating that the non-compete agreement with Waldrop was unenforceable under Alabama law and sent the letter to Robinson. However, according to Gant, when a dispute arose in the Waldrop matter in the mid to late 1980s regarding the enforceability of the covenant not to compete, Robinson argued forcefully that the covenant was valid and enforceable. Additionally, although Gant was of the general opinion that covenants not to compete were difficult to enforce against professionals when he provided legal advice regarding the covenants not to compete in the Woodham and Waldrop matters, given the uncertainty of the law at that time, Gant was not unequivocally certain that such covenants were unenforceable and never advised Robinson that such covenants were unquestionably unenforceable.

The bottom line here is that the evidence leaves one doubt as to whether Robinson did or did not know that the non-compete agreement was unenforceable. For that reason,

this is not a proper subject for summary judgment but, rather, is better suited as the grain for the grist mill of a jury trial.

### B.    Did Robinson breach the noncompete provision?

#### 1.    The Business of the Firm

The 1994 agreement included the following language: "SELLER, LEE, hereby agrees not to compete in any way with the business of the Firm."  In order to determine if Robinson competed with the firm, the Court must determine exactly what "the business of the Firm." All parties agree that the Firm is in the business of a certified public accounting, but the question remains regarding what specific kinds of activities were undertaken by the Firm as part of its business.  Plaintiff continually stated in response to defendants' statements of fact that "BS&C was engaged in the practice of certified public accounting and offered services related directly to certified public accounting." The plaintiff either stated in his deposition or admitted by agreeing to the undisputed facts in the pretrial order, however, that the firm carried out due diligence investigations, dealt with lawyers and banks for clients, discussed the bond and stock market with clients, provided business planning and advice, etc. In the face of his own testimony, the plaintiff can hardly argue that the firm's only business was certified public accounting when that testimony clearly indicates business activities beyond that of certified public accounting.

### 2.   Breach of Non-Compete Contract

"In order for a breach to justify the injured party's suspending performance, the breach must be significant enough to amount to the nonoccurence of a constructive condition of exchange. Such breach is termed 'material.'" E. Allan Farnsworth, Contracts § 8.16 at 638 (2d ed. 1990). "A material breach is one that touches the fundamental purposes of the contract and defeats the object of the parties in making the contract." *Sokol v. Bruno's, Inc.*, 527 So. 2d 1245, 1248 (Ala. 1988). In other words,

> [a] material breach occurs only when an injured party has sustained a substantial injury by the breach. The Restatement (Second) of Contracts § 241 (1979) suggests five criteria to consider in assessing whether a breach of contract is material. The criteria involve considering: (1) the extent to which the injured party will be deprived of the benefit which she reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which she will be deprived; (3) the extent to which the breaching party will suffer forfeiture; (4) the likelihood that the breaching party will cure; and (5) the extent to which the behavior of the breaching party comports with standards of good faith and fair dealing.

*Malladi v. Brown*, 987 F. Supp. 893, 905 (M.D. Ala. 1997). Further, "[u]nder general principles of contract law, a substantial breach by one party excuses further performance by the other." *Nationwide Mut. Ins. Co. v. Clay*, 525 So. 2d 1339, 1343 (Ala. 1987).

As exemplified by the following discussion of the relevant facts, the evidence is insufficient to establish with the requisite degree of certainty whether the plaintiff's breach of the noncompete agreement was material.

### a.    Joy Adams

With regard to Joy Adams, it appears that Robinson, after leaving the Firm, did work for her which was substantially of the same nature of the work he did for her while an employee, officer, and shareholder of the Firm.   During Robinson's tenure with the Firm, the Firm provided services to Adams such as dealing with banks, lawyers, real estate agents and general management advice.   After departing from the Firm, Robinson's work for Joy Adams has included dealing with banks, lawyers, real estate agents and general management in his capacity as business manager.   Robinson began providing advice to Joy Adams in the Spring of 1996, and now serves as business manager for Destin Management Company.   Further, Marpoint, Robinson's company, was paid by Adams for services rendered on March 31, 1996, described as preparing for a meeting to review trust statements.   Adams had conversations or meetings with Robinson concerning trust statements while he was associated with BS&C. It is unclear, however, how much work the plaintiff has actually performed for Ms. Adams and her related businesses and whether that work was sufficient to constitute a material breach of the noncompete agreement.

### b.    The Goodwins

The Goodwins were clients of the Firm during Robinson's tenure there. Prior to Robinson's departure, the Firm's work for the Goodwins included discussions of the bond and stock markets. Robinson admits he spoke to the Goodwins about the stock and bond markets after his departure from the Firm but disputes the characterization of his discussions as "work." According to the plaintiff, he informally and without pay discussed

certain financial matters with the Goodwins during personal, non-business conversations he had with them following his resignation from BS&C and prior to Mr. Goodwin's death. Following Mr. Goodwin's death, Adams asked Robinson to serve as the business manager over Mr. Goodwin's business affairs.

The Court is unsure as to whether Robinson's work for Adams after Mr. Goodwin's death constitutes a material breach in combination with Robinson's other work for Adams because the Court does not know how much he was paid, the true amount of work he completed, etc.

<strong>c.    Sutherland & Associates</strong>

As for Sutherland and Associates, there is no evidence Robinson was paid for work done for Sutherland after he left the firm. The evidence suggests that he conducted a due diligence investigation for personal reasons and reported the results to Sutherland, but no evidence of payment was presented. The Court does not find any evidence as to Sutherland to demonstrate that Robinson breached the non-compete agreement.

**C.    Conclusion**

The available evidence leaves the court faced with several genuine issues of material fact such that summary judgment on behalf of the defendants must be denied. These are questions for the jury to decide. Defendant's Motion for Partial Summary Judgment will be denied.

## VI.    Plaintiff's Motion for Summary Judgment

Plaintiff seeks summary judgment on the defendants' amended counterclaims which include count three, fraudulent suppression and inducement, and count four, breach of a fiduciary duty.  Both counts are based on the allegation that plaintiff did not communicate information he gained from the firm's attorney regarding the enforceability of noncompete provisions in 1989 and 1990 and plaintiff removed files concerning the same when he left the firm in the end of 1994, breaching his fiduciary, statutory, and common law duty to the firm.  Additionally, the defendant asserts that the plaintiff breached those duties when he did not inform the firm of his knowledge prior to the 1991 and 1994 agreements.

Plaintiff makes two arguments as to why the court should grant his motion.  First, plaintiff argues that according to Alabama case law, defendant cannot claim fraudulent suppression of the law.  Second, plaintiff argues that defendants' claims of breach of fiduciary duty and fraudulent suppression and inducement are barred by the two-year statute of limitations.

### A.    Suppression of the law

Defendants contend that the issue is not suppression of the law, but plaintiff's duty as a fiduciary of the company and requirement to disclose to the other members/partners the information received from the company's attorney.  Defendants also argue that when there is a confidential relationship or special circumstance, silence may be the basis for a cause of action for fraudulent suppression.  The confidential relationship in this case is that of a corporate director/officer and corporation.  Defendants further argue that the evidence

- 22 -

establishes plaintiff's failure to inform the other members of the firm about the likely unenforceability of noncompete provisions involving professionals.

Plaintiff replies that the parties to the 1991 and 1994 agreements are contracting parties, not fiduciaries. Each party could have retained an attorney to examine the agreement made between the partners/officer/associates of the firm. Moreover, the plaintiff argues that the defendants knew of the likely unenforceability of the agreements.

In the opinion of the Court, the defendants have stated a cause of action for breach of fiduciary duty and fraud. "[A] corporation's officers and board of directors owe certain fiduciary duties to the corporation, under any state's corporation law." *Disctronics v. Disc Mfg.*, 686 So. 2d 1154, 1160 (Ala. 1996). A corporate officer and director who maintains a fiduciary duty to a corporation certainly is in a confidential relationship with that corporation. *Alagold Corp. v. Freeman*, 20 F. Supp. 2d 1305, 1311 (M.D. Ala. 1998).

> Silence is not actionable unless there is a confidential relationship or some special circumstance that imposes a duty to disclose. *Wilson, supra*. Whether there is a duty to speak depends upon the fiduciary, or other, relationship of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances of the case. Ala. Code. 1975, § 6-5-102.

*Bama Budweiser v. Anheuser-Busch*, 611 So. 2d 238, 245-46 (Ala. 1992).

Further, the Court cannot determine that the plaintiff did not breach his fiduciary duty or commit fraud as a matter of law. On the one hand, the Firm may have had knowledge that the covenants not to compete were unenforceable. In regards to the Waldrop matter, Gant testified that he advised Schillaci that the covenant not to compete would be difficult to enforce due to Waldrop's professional status. Additionally, Robinson may have believed

the covenant was enforceable and therefore did not withhold any information from the Firm. According to Gant, when a dispute arose in the Waldrop matter in the mid to late 1980s regarding the enforceability of the covenant not to compete, Robinson argued forcefully that the covenant was valid and enforceable.  On the other hand, Robinson may have withheld from the Firm information that its own attorney held serious reservations concerning the enforceability of such noncompete agreements.  Schillaci testified that Gant never told him there was a problem with the enforceability of a covenant not to compete as to a professional. Additionally, Gant understood that Robinson served as his point of contact on legal matters for the Firm and explained to Robinson many times that he thought the non-compete was not valid.  Finally, Schillaci drafted the 1994 agreement and the Firm would not have agreed to the 1994 Agreement without Robinson's promise not to do any work for the Firm's clients if such work competed with the business of the Firm. This tends to suggest the Firm members thought they could enforce the non-compete agreement. Therefore, as the material facts are in dispute, the issue is left for the jury to decide.

### B.    Statute of Limitations

Plaintiff argues that defendants' claims of breach of fiduciary duty and fraudulent suppression and inducement are barred by the two-year statute of limitations on fraud claims.  Defendants contend they learned of the facts underlying the claim within two years of the claim.

> In Alabama, pursuant to Ala. Code 1975, §§ 6-2-38, an action for fraud is subject to a two-year statute of limitations. However, since its inception, Ala. Code 1975, §§ 6-2-3 ("the saving provision"), has extended the time period for a right of action until either the party discovered or should have discovered the fraud:

"In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute the action."

If it appears that the statutory period has expired, then the burden is on the party bringing the fraud action to show that he comes within the purview of this provision. *See Hicks v. Globe Life & Accident Insurance Co.*, 584 So.2d 458 (Ala. 1991). In *Hicks* (and the cases cited therein), this Court reiterated the objective standard for determining when a party should have "discovered" fraud for the purpose of the statute of limitations, emphasizing that "the mere fact that the standard is an objective one does not foreclose a jury determination on the issue." Rather, as this Court stated in Hicks, quoting *Thompson v. National Health Ins. Co.*, 549 So.2d 12, 14 (Ala. 1989) (quoting *Vandegrift v. Lagrone*, 477 So.2d 292, 295 (Ala. 1985)):

"The law in Alabama has long been that 'the question of when a party discovered or should have discovered fraud which would toll the statute of limitations is for the jury.'

"The question of when a plaintiff should have discovered fraud should only be taken away from the jury and decided as a matter of law in cases in which the plaintiff actually knew of facts which would put a reasonable person on notice of fraud.

*Green v. Wedowee Hosp.*, 584 So. 2d 1309, 1312 (Ala. 1991).  In this case, this decision is one for the jury.   Boohaker testified that the first time he received information indicating that non-competes for professionals may be unenforceable was in the Summer of 1996. Considering the evidence discussed above, there are genuine issues of material facts as to when the firm discovered the possibility that non-competes for professionals were invalid.

## C.    Conclusion

Plaintiff's Motion for Summary Judgment on Counts III and IV of defendant's Amended Counterclaim will be denied.

An appropriate judgment will be entered with this memorandum of opinion.

Done, this _____ of April, 2001.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE